FILED
10/17/2018
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 20, 2018 Session

**THOMAS EDWARD CLARDY v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2006-B-1065     Seth W. Norman, Judge**

_____

**No. M2017-01193-CCA-R3-PC**

_____

Petitioner, Thomas Edward Clardy, appeals the denial of his petition for post-conviction relief from his convictions for first degree murder, two counts of attempted first degree murder, and three counts of reckless endangerment. Petitioner argues that he received ineffective assistance counsel, that he is actually innocent, and that the trial court erred by denying him the opportunity to make an offer of proof at the post-conviction hearing. After a thorough review, we conclude that Petitioner has failed to establish that he received ineffective assistance of counsel and failed to prove that he is actually innocent. Though Petitioner should have been given the opportunity to make an offer of proof, we hold that this error by the post-conviction court was harmless. Accordingly, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Manuel B. Russ, Nashville, Tennessee, for the appellant, Thomas Edward Clardy.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Leslie E. Price, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On July 29, 2005, a group of men fired shots at Kirk, Melissa, and Kent Clouatre at an automobile body shop in Madison, Tennessee.[1] *State v. Thomas Edward Clardy*, No. M207-02729-CCA-R3-CD, 2009 WL 230245, at \*1 (Tenn. Crim. App. Feb. 2, 2009), *perm. app. denied* (Tenn. June 15, 2009). One man's shots killed Kirk and wounded Melissa, Kirk's wife. *Id.* Another man's shot wounded Kent, Kirk's twin brother. *Id.* During the shooting, Kirk and Melissa's two children and another child were sitting in a car at the body shop. *Id.* The group of men retreated to their vehicle and fled the scene. *Id.* Police recovered several spent cartridge casings, live rounds, and projectile fragments from the scene but did not recover any weapons believed to belong to the assailants. *Id*. at \*7-8.

The identification of the perpetrators was the central issue during the investigation and at trial. Kent testified about his identification of Petitioner and testified regarding his descriptions of the other men. At trial, Melissa did not remember giving descriptions of the suspects to the police, even when confronted with her statements to the police.

Kent said that a man whom he knew as "T" fired the shots that killed Kirk and struck Melissa. "T" was the only one of the three suspects that Kent had seen before. Kent identified Petitioner as "T" in a photographic lineup and at trial. Kent testified that "T" used a "[s]emiautomatic .40 caliber" pistol. At the beginning of the investigation, Melissa gave police officers the initial "D" when attempting to identify one of the perpetrators, but later the initial changed to a "T." Kent used the initial "T" every time that he was interviewed by Officer Cynthia Quirouette. Officer Quirouette maintained that "T" was the initial that came out through the rest of the investigation. However, she was not confident in the truthfulness of the witnesses during the investigation.

When describing the suspect who shot at him, Kent said, "He's a little bit heavy set man, little shorter. He had gold, I guess in his teeth, diamonds were set sideways, when he gritted [sic] at me." He described the weapon used by this man as a .38 caliber revolver. Kent described the third individual as a taller, thin guy. Melissa only described the third man. Her description was limited to the fact that he was wearing a blue shirt. When describing this suspect's gun, Kent was unsure of the caliber, but stated that it was semiautomatic. However, neither Kent nor Melissa recounted this individual firing a weapon.

Melissa described the vehicle used by the suspects as a "'96 or '97 Sable or Taurus, blue with an oval back." Melissa also described the color as "blue or possibly green." According to Officer Quirouette, Kent described the vehicle as an "'84 to '86 four-door Buick Century or Celebrity, silver or gunmetal gray." Officer Quirouette

---

[1] For the purposes of clarity, this opinion will refer to each victim by his or her first name. We intend no disrespect.

admitted that the descriptions were "totally different." However, at trial, Kent disavowed any statement that the car was a Buick and asserted that the vehicle was a "forest green Ford Taurus." Royleesha Mason, Petitioner's wife at the time of the crime, owned a teal green 1996 Mercury Sable, which is very similar in appearance to a Ford Taurus. That car was frequently driven by Petitioner.

After hearing these identifications along with other evidence of the crime, a jury convicted Petitioner for the first-degree murder of Kirk in Count One, the attempted first-degree murder of Kent in Count Two, the attempted first-degree murder of Melissa in Count Three, and the reckless endangerment of the three children in Counts Four through Six. *Id.* at \*1. Petitioner appealed. This Court affirmed his convictions, and our supreme court denied review. *Id.* In December of 2009, Petitioner filed a timely pro se petition for post-conviction relief. Multiple amendments and seven attorneys later, a post-conviction hearing commenced in September of 2016. The evidence adduced at the hearing will be discussed in detail in our analysis of the issues addressed on appeal. The post-conviction court denied relief, and this timely appeal soon followed.

*Analysis*

Post-conviction relief is available for any conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. In order to prevail in a claim for post-conviction relief, a petitioner must prove his or her factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). On appeal, a post-conviction court's findings of fact are conclusive unless the evidence preponderates otherwise. *Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006). Accordingly, questions concerning witness credibility, the weight and value to be given to testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction court, and an appellate court may not substitute its own inferences for those drawn by the post-conviction court. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001). However, the post-conviction court's conclusions of law and application of the law to the facts are reviewed under a purely de novo standard, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

*I. Ineffective Assistance of Counsel*

Both the Sixth Amendment to the Constitution of the United States and article I, section 9 of the Tennessee Constitution guarantee the right of an accused to the effective assistance of counsel. *See Davidson v. State*, 453 S.W.3d 386, 392–93 (Tenn. 2014). In

order to sustain a claim of ineffective assistance of counsel, a petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under the two prong test established by *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a petitioner must prove that counsel's performance was deficient and that the deficiency prejudiced the defense. *See State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel applied in federal cases also applies in Tennessee). Because a petitioner must establish both elements in order to prevail on a claim of ineffective assistance of counsel, "failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). "Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697). Whether a petitioner has been denied the effective assistance of counsel presents a mixed question of law and fact. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). This Court will review the post-conviction court's findings of fact "under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d); *Henley*, 960 S.W.2d at 578).

The test for deficient performance is whether counsel's acts or omissions fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 688; *Henley*, 960 S.W.2d at 579. This Court must evaluate the questionable conduct from the attorney's perspective at the time, *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982), and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. This Court will not use hindsight to second-guess a reasonable trial strategy, even if a different procedure or strategy might have produced a different result. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). However, this deference to the tactical decisions of trial counsel is dependent upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Even if a petitioner shows that counsel's representation was deficient, the petitioner must also satisfy the prejudice prong of the *Strickland* test in order to obtain relief. The question is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). A petitioner must show that there is a reasonable probability "sufficient to undermine confidence in the outcome" that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Burns*, 6 S.W.3d at 463 (quoting

*Strickland*, 466 U.S. at 694). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* (quoting *Strickland*, 466 U.S. at 691).

*A. Investigation and Presentation of Evidence Relating to Alternate Suspects*

Petitioner first argues that trial counsel was ineffective because she failed to obtain independent ballistics testing of the cartridge casings found at the crime scene and failed to present evidence of alternate suspects based upon that ballistics testing. The State contends that trial counsel's choice to eschew ballistics testing was a tactical decision because the State had no evidence, other than eyewitness testimony, tying Petitioner to the crime scene. Accordingly, trial counsel chose to forego any scientific testing that might possibly inculpate Petitioner. Additionally, the State asserts that it is unclear how trial counsel would have prepared differently for Petitioner's case if she would have known that the cartridge casings in this case matched guns used in two other shootings less than a year later. We agree with the State's assessment of trial counsel's tactical decision.

With regard to the description of the suspects, Officer Quirouette recalled Melissa giving different heights and weights for each suspect and changing the number of suspects from four to three. At one point, Kent gave police the name "Darrell." Melissa's notes contained the name "Darrell" as well. During an interview, Melissa identified an individual from a photographic lineup that was not Petitioner.

Pursuant to an agreed order entered by the post-conviction court in November of 2015, Bridget Chambers, a forensic firearms examiner with the Metro Nashville Police Department, reexamined cartridge casings of three different calibers that were recovered from the crime scene. Upon reexamination, she discovered a match for the two .40 Smith and Wesson caliber cartridge casings. Ms. Chambers matched those casings to a Glock 23 handgun that was used in a July 5, 2006 crime by an individual named Dantwan Collier, who had "gold teeth." Additionally, Ms. Chambers matched the two 9mm cartridge casings recovered from the crime scene to other 9mm cartridge casings that were found at the scene of a January 5, 2006 homicide involving Dantwan Collier's cousin, Thomas Collier. Finally, Ms. Chambers matched the .380 auto cartridge case to a Hi-Point pistol chambered in .380 auto that had been used in a 2006 case. No explanation was given for the significance of the match of the .380 auto cartridge.

Prior to Petitioner's trial in July of 2007, trial counsel did not request any ballistics testing in Petitioner's case. Trial counsel explained, "I didn't want to give the State an opportunity to find something they may have missed if [Petitioner's] DNA was there. The ballistics, nobody had tied – nothing had been tied to [Petitioner.]" Trial counsel did not recall a weapon being associated with Petitioner and did not recall Petitioner having

any prior convictions for possession of a firearm. Had trial counsel known that the ballistics from the cartridge casings would match weapons used in two other crimes prior to trial, she "probably" would have used that information as part of Petitioner's defense.

The post-conviction court found that trial counsel's decision to decline ballistics testing of the cartridge casings recovered from the crime scene was not deficient performance. The post-conviction court attributed to hindsight Petitioner's argument that an alternate suspect could have been developed from ballistic testing. The post-conviction court surmised that ballistics results linking the recovered cartridge casings to a gun used by another person would not necessarily rule out Petitioner's involvement in the crime because there were three suspects.

Like the post-conviction court, we recognize that hindsight is always twenty-twenty. Now that ballistics testing has been conducted, revealing exculpatory evidence, it is easy to look back at trial counsel's decision to forego ballistics testing with a critical eye. However, if the ballistics testing had revealed a match to a firearm registered to Petitioner, then Petitioner would have had abysmal chances of prevailing at trial. We evaluate trial counsel's actions "from the attorney's perspective at the time," *see Hellard*, 629 S.W.2d at 9, and at the time there was no physical evidence linking Petitioner to the crime scene. At the time that she was preparing for trial, there was a chance that ballistics testing might reveal either exculpatory or inculpatory evidence. Rather than take a risk, trial counsel made the tactical decision to play it safe and argue that Kent's identification, the only thing linking Petitioner to the crime, was inaccurate and incorrect. As the United States Supreme Court has recognized,

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland*, 466 U.S. at 690-91. At the time that trial counsel decided to forego ballistics testing, she made a reasonable decision. Therefore, we decline to hold that trial counsel's representation was deficient.

### B. Investigation of the Blood Trail

Petitioner claims that trial counsel was deficient because she did not investigate a trail of blood that led away from the crime scene. The State counters this argument by stating that it is unclear how this evidence could have helped Petitioner impeach Kent at

trial.  Also, the State contends that Petitioner has pointed to nothing in the record showing how trial counsel should have investigated the blood trail or how she could have used that information at trial.  We agree with the State.

At the post-conviction hearing, Officer George Bouton, a crime scene investigator with Metro Police, noted that there was a blood trail at the crime scene.  He collected samples of blood from the trail at various points.  Rachel Mack, a forensic scientist with the Metro Police Crime Laboratory, compared several swabs of bodily fluids recovered from the crime scene to the DNA profiles of Petitioner and Kirk.  Testing revealed one partial DNA profile from all fourteen swabs that was consistent with the profile of Kirk.  Ms. Mack opined that if Kirk had an identical twin, then that would be relevant to the analysis of the partial DNA profile.[2]  Petitioner's DNA did not match any of the DNA profiles recovered from the crime scene.

The post-conviction court did not find trial counsel deficient for not having the blood trail tested for DNA.  According to the post-conviction court, it was apparent that the blood trail was from one of the victims because no testimony indicated that any of the suspects were injured.  As a result, the post-conviction court did not think that DNA evidence from the blood trail would be probative.  Furthermore, the post-conviction court considered this decision to be a trial tactic because a DNA match of the blood trail to Petitioner would have been "cataclysmic for the defense strategy of mistaken identity."

Though we conduct a de novo review, we agree with the post-conviction court's reasoning.  There was no evidence that any suspect was injured.  Thus, it was likely, even without DNA testing, that the blood belonged to one of the victims.  Trial counsel was not deficient for foregoing DNA testing of the blood trail.  Kent testified that he stayed at the shop after the shooting, and a match of the DNA from the blood to Kent may have given trial counsel another point on cross-examination.  But, it would not have affected the outcome of the trial.  Thus, trial counsel was not deficient, and Petitioner was not prejudiced.

### C.  DNA Testing of "Various Objects"

Petitioner claims that trial counsel was ineffective because she failed to obtain DNA testing of "various objects."  Petitioner argues that he has always maintained his innocence to trial counsel, so her testimony that she did not conduct DNA testing on "various materials" out of fear that it may lead to incriminating evidence against Petitioner is illogical.  The State counters by pointing out that Petitioner does not identify what these "various materials" are or how DNA testing would have been useful.  We

---

[2] The record reveals that Kirk and Kent Cloautre were twins, but it does not specify if they were identical or fraternal twins.

agree with the State. Because Petitioner presented no evidence of what DNA testing should have been conducted and/or how it would have benefitted him, he failed to demonstrate any prejudice. *See Davis v. State*, 912 S.W.2d 689, 698 (Tenn. 1995).

### *D. Failure to Provide Alibi Notice for Royleesha Mason*

Petitioner claims that trial counsel was deficient for failing to file an alibi notice for his wife, Royleesha Mason. The State contends that this claim must fail because Petitioner was able to present an alibi via a different witness. We agree with the State.

At trial, Kent estimated that the shooting occurred between 10:15 and 10:30 p.m. However, Chrystal Waltz, a private investigator hired by Petitioner's counsel, revealed at the post-conviction hearing that the 9-1-1 call occurred at 10:48 p.m., and Melissa's testimony at trial makes it appear as though she made the 9-1-1 call immediately after the shooting.

The State objected to Ms. Mason's statement on direct examination that Petitioner was at home playing video games at the time of the crime. The State argued that this was alibi testimony and that Petitioner had not given notice that Ms. Mason would be an alibi witness. Trial counsel did not see Petitioner's wife as a credible alibi witness, and did not file a notice of alibi witness for Petitioner's wife. At any rate, practically the same information was admitted, without objection, during the State's cross-examination of Ms. Mason when the prosecutor asked, "[I]t's your testimony that you know that [Petitioner] was home at your house on Buena Vista that whole day and that whole evening?," to which Ms. Mason responded, "Yes, he was."

Shakisha Thompson was able to testify as an alibi witness for Petitioner at trial. She testified that she picked up one of Ms. Mason's sons to take him bowling. When she returned at around 10:30 or 11:00 p.m., Petitioner answered the door. Ms. Thompson recalled Petitioner being calm and neatly dressed. Trial counsel remembered filing a notice of alibi witness for Ms. Thompson. Trial counsel thought Ms. Thompson was "level headed," "didn't have a dog in the hunt," and "wasn't . . . taking sides."

Petitioner has failed to show that he was prejudiced by this decision made by trial counsel. Ms. Mason essentially presented an alibi for Petitioner on cross-examination when she stated that Petitioner was at home with her the "whole day" and "whole evening" of the crime. Also, Petitioner presented Ms. Thompson as an alibi witness and she offered testimony placing Petitioner at home. Petitioner has failed to show that more specific testimony from Ms. Mason providing an alibi would have changed the outcome of the trial. Thus, prejudice has not been proven, and Petitioner is not entitled to relief on this claim.

## E. Failure to Effectively Cross-Examine Kent

Petitioner argues that trial counsel did not effectively cross-examine Kent because she did not inquire about the alleged drug activity at the body shop. The State responds that this was a reasonable trial tactic on the part of trial counsel. We agree with the State.

At the post-conviction hearing, trial counsel divulged that her strategy was to steer clear of any mention of drugs at trial. She stated, "I found out that the victim and his surviving twin were dealing drugs out of the auto shop . . . I didn't want [Petitioner] associated in the jurys' (sic) minds with drugs." She further explained, "Back in 2007 here is a young black male, with a predominately white jury, and to hear the word drugs[,] I was afraid that was all they were going to hear." "I made a conscious decision tactically because I did not want [Petitioner] associated in any way with the drug business," she added when speaking about a different piece of testimony.

After reviewing this testimony, it seems clear to us that trial counsel made a reasonable strategic decision to avoid the mention of drugs. This was not deficient. However, even if it were, Petitioner has failed to establish a reasonable probability that the outcome of the case would have been different had trial counsel cross-examined Kent on those points.

## F. Failure to Procure an Eyewitness Expert

Petitioner claims that trial counsel was ineffective by failing to procure an eyewitness identification expert. The State contends that Petitioner was not prejudiced by trial counsel's failure. We agree with the State.

Realizing that the only testimony directly linking Petitioner to the crime was the identification by Kent, trial counsel attempted to get an expert on eyewitness identifications. However, she could not get an eyewitness expert because there were difficulties determining how the expert witness would be paid. On one occasion, trial counsel gave an expert a ride to the airport to see if she would take Petitioner's case, to no avail. Looking back, trial counsel said "I apparently should have gotten an expert witness but I decided to go ahead with it." Trial counsel claimed she called "everybody" on the Tennessee Association of Criminal Defense Lawyers' list of expert witnesses, and she could not find an expert that Petitioner could afford or that would work for the fee paid by the State for expert witnesses working for indigent clients. Trial counsel offered clarification by saying she did not file a request for funds from the trial court because she "wanted to have one lined up before [she] did."

Dr. Jeff Neuschatz, an expert in psychology, testified at the post-conviction hearing and gave his opinion about the eyewitness identifications in this case. He said

that the presence of a weapon would impair a person's memory compared to a situation where a weapon was not present. He also pointed out that it is more difficult to give an accurate cross-racial identification than an identification of a person of the same race. He added that a head covering which covers the hairline on a person's head makes it more difficult to give an accurate identification. Finally, he spoke of "unconscious transference," which occurs when someone associates an unrelated individual with an event because they are familiar with that person from the same time and place as the event.

Dr. Neuschatz opined that Petitioner potentially suffered from a case of unconscious transference because Kent was familiar with Petitioner from Petitioner's previous visit to the shop. He also testified that the presence of a weapon, the presence of a head covering, and the cross-racial identification all affected the identification of Petitioner. On cross-examination, Dr. Neuschatz admitted that he could not form an opinion as to whether Kent's identification of Petitioner was correct or incorrect.

In conclusory fashion, Petitioner states in his brief, "If a jury had heard Dr. Neuschatz's information regarding eyewitness identification, both in general and in relation to [Petitioner's] case in particular, it would have reached a different conclusion." We disagree. Dr. Neuschatz could not opine as to the correctness of Kent's identification. Merely giving a jury more information to consider without negating the identification does not establish a reasonable probability, sufficient to undermine the outcome, that the result of the proceeding would have been different.

### G. Waived Claims

On appeal, Petitioner argues that trial counsel was ineffective because she failed to impeach Detective Satterfield effectively and that trial counsel was ineffective because she was unaware that Melissa had identified a different suspect. However, these claims were not presented in the numerous petitions filed in this case nor were these claims argued at the post-conviction hearing. Thus, these claims are waived. *See State v. Turner*, 919 S.W.2d 346, 356-57 (Tenn. Crim. App. 1995) (stating "A party may not raise an issue for the first time in the appellate court.").

### H. Cumulative Error

Petitioner also alleges cumulative error. "Reversals for cumulative error are rare." *State v. Herron*, 461 S.W.3d 890, 910 (Tenn. 2015). Our supreme court has summarized the doctrine as follows:

> The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation

constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

*State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010). In the post-conviction context, "a petititoner cannot successfully claim he was prejudiced by [trial] counsel's cumulative error when the petitioner failed to show [trial] counsel's performance was deficient." *James Allen Gooch v. State*, No. M2014-00454-CCA-R3-PCm 2015 WL 498724, at *10 (Tenn. Crim. App. Feb. 4, 2015). Petitioner has failed to prove that trial counsel was deficient or that he was prejudiced by any of the deficiencies alleged in his brief. Therefore, the cumulative error doctrine does not apply in this case.

## II. Actual Innocence

Petitioner also claims that he is actually innocent because he had an alibi for the time of the crime and there was a viable alternate suspect, Dantwan Collier. The State contends that Petitioner has failed to show his innocence with clear and convincing proof. We agree with the State.

A free standing claim of actual innocence may be brought under the Tennessee Post-Conviction Procedure Act. *Dellinger v. State*, 279 S.W.3d 282, 291 (Tenn. 2009) (citing T.C.A. §§ 40-30-102(b)(2) and -117(a)(2)). However, those claims are limited to claims based on newly discovered scientific evidence. *Id.* Petitioner must prove his claim by clear and convincing evidence. *Id.*

The only newly discovered scientific evidence put on at the post-conviction hearing was the ballistic testing of the cartridge casings at the scene of the crime. The ballistic testing revealed that a .40 caliber cartridge casing found at the crime scene matched a weapon used in a subsequent shooting by Dantwan Collier and the two 9mm cartridge casings matched a weapon used in a subsequent shooting by Thomas Collier. This evidence, while certainly exculpatory, does not prove Petitioner's innocence by clear and convincing evidence. There were three individuals who participated in the shooting in this case. This newly discovered evidence suggests that Dantwan Collier and/or Thomas Collier may have been involved. However, it does not mean that Petitioner was not one of the three men. Furthermore, it is possible that Petitioner possessed one of the firearms before Dantwan or Thomas Collier. So, even though the evidence is exculpatory, it does not prove Petitioner's innocence by clear and convincing evidence.

## III. Photographs of an Alternate Suspect

Petitioner claims that the post-conviction court erred by refusing to admit a photograph of an alternate suspect and by denying him the opportunity to preserve for appellate review pictures of an alternate suspect via an offer of proof. The State counters that the offered evidence was "plainly irrelevant." We agree with Petitioner that the photograph should have been admitted and that he should have been given the opportunity to make an offer of proof, but ultimately, we find this error to be harmless.

During Ms. Waltz's testimony about alternate suspects, post-conviction counsel sought to introduce pictures of Dantwan Collier. According to Ms. Waltz, Dantwan Collier's picture from social media revealed that he had gold teeth and tattoos with clear cutouts in them. The State objected to the introduction of the pictures on the ground of relevance. Post-conviction counsel argued that the pictures were relevant because Dantwan Collier, subsequent to this crime, possessed a firearm that matched the ballistics of a cartridge casing found at the crime scene. Post-conviction counsel requested the opportunity to give an offer of proof or to include the excluded exhibits in the appellate record, but the post-conviction court denied those requests. As the basis for his ruling, the post-conviction court stated:

> Because they were made too far after this and there is no connection in this record other than a weapon between this individual and this case, and that weapon could have been passed around to 40 different people between now and then. It is too remote and I will not allow it.

Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is admissible unless it is barred by some other rule of law. Tenn. R. Evid. 402. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. "[Q]uestions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this [C]ourt will not interfere in the absence of abuse appearing on the face of the record." *Pylant v. State*, 263 S.W.3d 854, 870 (Tenn. 2008).

Ordinarily, a picture of an alternate suspect would be irrelevant at a post-conviction hearing. However, when a claim of actual innocence is presented, as was the case here, evidence which might ordinarily be irrelevant may indeed be relevant. Here, a picture of an alternate suspect who possessed a firearm linked to the crime might be relevant because it could be compared to the description of the suspect given by the victims. Thus, the introduction of a picture of the alternate suspect might have a tendency to make it more or less likely that Petitioner was actually innocent. However,

because the post-conviction court did not allow Petitioner to make an offer of proof, there was neither identification nor authentication of the proffered exhibit submitted as proof nor do we have a copy of the picture to review. As such, we cannot determine whether the ruling by the post-conviction court was correct.

Generally, it is error to deny a party the opportunity to make an offer of proof. *Alley v. State*, 882 S.W.2d 810, 815 (Tenn. Crim. App. 1994). However, it is not error for the trial court to refuse to grant an offer of proof when "it is obvious from the record that the proffered evidence could, under no circumstances, be relevant to the issues." *Id.* at 816. Such is not the case here, where the record shows that a picture of the alternate suspect might have indeed been relevant and admissible. Thus, the post-conviction court should have allowed Petitioner to make an offer of proof identifying the exhibit, authenticating the exhibit, marking the exhibit for identification only, and including the exhibit in the record on appeal. *See State v. Goad*, 707 S.W.2d 846, 852-53 (Tenn. 1986) ("In order for an appellate court to review a record of excluded evidence it is fundamental that such evidence be placed in the record in some manner. When it is a document or exhibit, this is done simply by having the exhibit marked for identification only and not otherwise introduced.").

Ultimately, we determine this error to be harmless. In conducting a harmless error analysis, we must determine whether the error "more probably than not affect[ed] the judgment or would result in prejudice to the judicial process." *State v. Rodriguez*, 254 S.W.3d 361, 374 (Tenn. 2008). A picture may be worth a thousand words, but at least some of those words were revealed through the testimony of Ms. Waltz, specifically that Dantwan Collier had gold teeth and tattoos, which is the pertinent information that could be gathered from viewing the social media photograph. Even armed with this information, this Court would not likely reach a different conclusion because it does not undermine Kent's identification of Petitioner. Kent described the suspect that shot at him as the person with gold teeth. According to Kent, "T" was the suspect who shot Kirk and Melissa. At trial, Kent denied that he described "T" as having tattoos, and "T" is the suspect that Kent identified as Petitioner. Petitioner has failed to show that the post-conviction court's error of refusing to allow Petitioner to make an offer of proof prejudiced the judicial process in this case.

*Conclusion*

For the aforementioned reasons, we affirm the judgment of the post-conviction court.

_____
TIMOTHY L. EASTER, JUDGE